IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 18-35 |
| JOSEPH W. NOCITO | |

## THE UNITED STATES' RESPONSE TO DEFENDANT'S POSITION ON SENTENCING FACTORS

AND NOW comes the United States of America, by its attorneys, Eric G. Olshan, United States Attorney for the Western District of Pennsylvania, Gregory C. Melucci and Nicole A. Stockey, Assistant United States Attorneys for said District, and submits the within United States' Response to Defendant's Position on Sentencing Factors, as follows:

*__Wisdom, Thoughts and Life's Lessons from Joe Nocito__*:

*7.  Maintain the lifestyle of the 'Millionaire next door' (at least until you achieve the stage in life where have all the material things you want, your next generation is well taken care and it becomes a choice of giving it to the government or building a house of your dreams.)*

*17. Admit some things we do aren't the most financially sound like building 50,000 SF houses, but do them anyway because you have made enough good decisions financially to do whatever you want to do.*

Thoughts numbers 7 and 17 of 25, taken from a typewritten document seized by the IRS from the office of the Defendant during a search of AHS Inc. offices titled "**Wisdom, Thoughts and Life's Lessons from Joe Nocito**" dated September 2, 2000.

## I.    INTRODUCTION

In his Objections to the Presentence Investigation Report, Doc. 313 (hereafter, PSR Objections;) the Defendant, Joseph W. Nocito (hereafter Nocito or Defendant) argues that he deserves a non-incarceration, in other words, a home confinement sentence- for the most

staggering tax fraud in the history of western Pennsylvania. However, as will be argued in the United States' forthcoming <u>Sentencing Memorandum</u> and through evidence presented at the sentencing hearing, Nocito directed a complex scheme to cheat and deceive the IRS out of an estimated $93 million in both personal and business income, causing unreported personal taxable income of $26,933,628 resulting in tax losses and restitution owed to the IRS totaling $15,824,056.[1] With the assistance of two employees , between 2006 and 2012 Nocito used multiple shell entities to hide millions of dollars from the IRS where he illegally expensed $21 million dollars in the construction of his $30 million dollar, 51,000 sq. ft. mansion /residence in Bell Acres, Sewickley, he affectionately refers to as *"Villa Noci."*[2] Mr. Nocito illegally expensed virtually every item that went into the construction and furnishing of the home and property-from the interior furnishings, wall hangings, woodwork, and appliances, to the exterior landscaping, pool and pool house, tennis courts, bocce courts, playground and basketball court, all contained within his 6 acre expansive Bell Acre estate.

Additionally, evidence will show that Mr. Nocito substantially funded and illegally expensed millions of dollars of his personal life and those of his children, grandchildren and other family members through the same organizations. Bank records will reveal millions spent in purchasing and financing homes for his children, education expenses for his grandchildren, and

---

[1] $26,933,628 represents unreported personal taxable income to the Defendant. The restitution balance of $15,824,056 represents the collective tax restitution owed for both personal and corporate tax losses, arrived at as follows: the corporate tax loss $11,779,110, and the personal $4,044,946. The calculation of criminal tax loss in paragraph 21 of the PSR of approximately $30,217,410. was determined by using a higher tax rate, but uses a different tax rate calculated by the IRS for corporate income, and taxes paid by the defendant.

[2] An appraisal of the home in 2001 described 28,000 sq. ft of living space, including a 5,300 sq. ft garage. The replacement construction cost was $29,835,000.  It is the largest personal residence in Pennsylvania, and in the top 100 nationwide. By way of comparison, the White House is estimated at 55,000 sq. ft, and former President Donald Trump's Mar A Lago is 46,650 sq. ft.

thousands spent for exotic cars, artwork, personal fitness, and several country club memberships. Records will show that he illegally expensed living expenses including salaries and expenses for the *Villa Noci* cook, butler, and landscaper.

While largely illegally expensing much of his personal life and for his family, he also contrived a scheme to cheat the IRS of corporate income tax in the operation of his many companies by devising an elaborate scheme to funnel AHS Inc. profits through companies he controlled  to make  the bottom line appear at the end of the fiscal year that these companies had no earned income. To accomplish this, Mr. Nocito had to create alternating FY end dates for each company, and shift money between the companies which he directed to be falsely recorded as "management" or "consulting" fees in company books.  Otherwise reportable income originating from AHS through AHS Delaware (aka AHS DE -the AHS management company) to entities such as Nocito Enterprises, Jonolley Properties, and Palace Development (referred to by the Defendant the "Texas corps") was hidden from the IRS for years.

Ultimately, the illegal expense and funneling schemes required the Defendant to take the third step in the massive deception-the handwritten swearing to falsified years of both corporate (1120) and personal (1040) income tax returns in which he falsified earned income and expenses. All told, between 2006 and 2012, Joseph W. Nocito concealed and underreported approximately $93 million  of income from the IRS not reflected on his personal and business tax returns.

Despite this, the Defendant requests a sentence which belittles the sentencing factors, asking this Court to ignore both the magnitude of the tax fraud, to ignore just punishment, and receive a sentence of home confinement at Mr. Nocito's second residence on Bucks Tail Road

in Pittsburgh. PSR Objections, p. 2. Instead, the only appropriate sentence is one within the proposed stipulated guideline range in the Plea Agreement of 36-47 months incarceration.

II.  **THE USSG DETERMINED BY THE OFFICE OF PROBATION IS A CORRECT GUIDELINE RANGE CALCULATION**

The <u>Introductory Comment</u> to Part T of the <u>Federal Sentencing Guidelines</u> for Tax Offenses provides that the Court's sentence shall:

"…serve to punish the violator and promote respect for the tax laws'…that it shall 'deter[ing] others from violating the tax laws' which is a 'primary consideration' and consequently, the sentence should be 'commensurate with the gravity of the offense'…and act as a 'deterrent to would-be violators.' "

See <u>Federal Sentencing Guidelines</u>, Part T, Introductory Comment. With this premise as guidance, the evidence the United States will present in argument and at the sentencing hearing will demonstrate that the Defendant deserves a significant period of incarceration because of the gravity of the crime,  for its deterrent effect upon would be tax violators, and because Mr. Nocito does not deserve any downward departures under USSG 5H et seq., nor variances from the guidelines range agreed to by the parties.

Initially, there are two USSG calculations before the Court: one calculation prepared by the Office of Probation as detailed in the PSR (Doc. 310, paras.21-30), and a USSG range agreed to by the United States and Mr. Nocito in the Plea Agreement (paras C. 2-3). In the Plea Agreement, the United States agreed to concede certain Offense Characteristics  otherwise readily provable.[3]  Both guideline ranges are calculated in accordance with USSG 2T1.1 et seq.,

---

[3] The United States conceded both Offense Characteristics under 2T1.1(b) solely for the purpose of negotiating a plea agreement in light of the fact that the statutory maximum sentence for the count of conviction is 60 months incarceration, 18 U.S.C. Sec. 371.

pursuant to the count of conviction - Count One, 18 U.S.C. Section 371, Conspiracy to Defraud the United States, or more commonly referred to as a "Klein Conspiracy."[4]  The Plea Agreement calculation is merely the negotiated terms recommended to the Court.  All tax fraud cases are calculated in accordance with USSG 2T1.1, and begin with the measure of the criminal tax loss. The Guidelines instruct that the tax loss is the "total amount of loss that was the object of the offense." USSG 2T1.1(c).  The Notes to 2T1.1 define the tax loss as the "criminal figures."

Here, IRS agents provided the Office of Probation a criminal tax loss figure for both personal and corporate unreported taxes caused by the Defendant totaling $26.933 million dollars.  2T1.1(a) instructs the PSR officer that the Base Offense Level is arrived at by identifying the appropriate corresponding tax level in the "Tax Table" in 2T4.1. The Probation Officer determined then performed a tax loss calculation and arrived at an overall tax loss of $30,217,410 which, under the Tax table, equates to a level "K", or numerical offense level 28.[5]

Additionally, 2T1.1 instructs that certain "Specific Offense Characteristics" under 2T1.1(b) may be applied based upon reasonably provable facts. The Guidelines direct that 2 additional levels shall be added to the Base Offense Level if it can be shown that the Defendant "failed to correctly identify the source of income exceeding $10,000 in any year…" Id. (b)(1). That is plainly recognizable from the false tax returns.  Additionally, two more levels may be added if the offense involved "sophisticated means."[6]   No doubt the Defendant's scheme clearly was

---

[4] Both calculations of tax loss incorporate losses for other counts in the indictment as relevant tax loss.

[5] The PSR officer's of the tax loss is higher because it did not include the more specific tax rate calculation by the IRS and taxes paid by the Defendant. The more accurate tax loss calculation as agreed to by the parties in the Plea Agreement of $15,824 million is the precise tax loss. The guideline range, as adjusted, would be 26 under the Tax Table, plus the additional 4 levels, or overall 32 before a 3-level reduction for acceptance of responsibility, or 87-108 months. Overall immaterial to the United States' argument opposing any downward departures or variances.

[6] "Sophisticated Means" is described in the Commentary n.5 as any "especially complex or especially intricate

"sophisticated" since it required several persons to engage in concealing and falsifying company books to hide taxable income, along with a complex "money shuffling" scheme designed to hide corporate income.

Additionally, as stated in the Factual Basis at the plea hearing on November 17, 2022, Mr. Nocito directed AHS Inc. company employee bookkeeper and convicted conspirator Ann E. Harris to falsify corporate books which enabled the fraud and deceived the IRS. His behavior properly warranted an adjustment for Role in the Offense of an additional two levels under USSG 3B1.1(c). In consideration of the tax calculation adjustments noted in footnote 5, the adjusted base offense level of 29 (following a 3-level reduction for acceptance of responsibility) equates to an overall Guideline Range of 87-108 months incarceration. Nevertheless, although beyond the statutory maximum sentence, the Guideline Range is an essential calculation by which this Court can begin to understand the magnitude and scope and complexity of the Defendant's harm to the IRS, and a barometer to be measured against the reasonableness of the terms of the Plea Agreement.

Through the negotiated Plea Agreement however, the parties have stipulated to a non-binding guideline range based upon a loss stipulation, arriving at a recommended sentencing range of 37-46 months incarceration. Plea Agreement, paras. C. 2-4, which largely reflects the criminal tax loss. The United States made concessions for Offense Characteristics and criminal tax loss only due to the Defendant's agreement to make full restitution of $15,824,056 prior to

---

offense conduct pertaining to the execution or concealment of an offense. e.g., hiding assets or transactions or both, through the use of fictitious entities, corporate shells,…"

sentencing, and because of the limitations imposed by the statutory maximum sentence.[7]  It should

not be inferred as a lessening of the seriousness and enormity of this crime.


### III.	THE DEFENDANT IS NEITHER TOO OLD OR INFIRM UNDER USSG 5H1.1, NOR DOES HE HAVE ANY EXTRAORDINARY PHYSICAL IMPAIRMENT MAKING HIM SERIOUSLY INFIRM UNDER 5H1.4 WARRANTING A DOWNWARD DEPARTURE AND HOME CONFINEMENT

The Defendant asserts that he will argue for a downward departure that his age, 81

years at sentencing, his "struggles with obesity",  a possible "knee replacement" in November, and

previous treatment for melanoma, make him a person who cannot "acclimate to prison."

Objections to PSR. p. 5;  PSR paras. 40 and 41.  However, Defendant's reliance on USSG 5H1.1

and 5H1.4 is not applicable in the Defendant's circumstance. USSG 5H1.1 entitled "Age (Policy

Statement) recommends that a defendant's age may be relevant in determining whether a departure

from the guideline range is warranted, but only if it is in combination with other offender

characteristics which are present to an unusual degree and distinguishable from the typical cases

covered by the guidelines.  See 5H1.1(emphasis added).  The guideline  further suggests that  in

some instances, a defendant's age may be a factor where the defendant is also "elderly and

infirm…"  Id..

Clearly, the enormity and gravity of this crime heavily weigh against considering

age as a factor for departure under 5H1.1.  This  is the largest personal tax fraud in the history of

this District, causing criminal tax losses in excess of $26 million dollars.  It involved years of

---

[7]See Plea Agreement para. A.10. The Defendant has paid $5,000,00 to the Clerk's Office towards restitution at the plea hearing.

falsification of both personal and corporate tax returns and exposed two other AHS Inc. employees and conspirators to face criminal investigation.  Yet, courts have routinely ignored requests for downward departures for age and infirmity claims when  a defendant has engaged in serious and sustained criminal fraud that results in significant harm.  For instance, in <u>United States v. Seljan</u>, 547 F.3d 993, 998 (9th Cir. 2008), (district court sentenced an 87-year old fraud defendant to 240 months' imprisonment, and ignored his motions for age and infirmity related downward departures, and focused instead on the seriousness of the fraud offense.) Similarly, in <u>United States v. John F. Hogan</u>, Judge Hornack rejected defendant's requests for a downward departure for age and health conditions and sentenced a 78 year old defendant with chronic age related disease to 10 years imprisonment for orchestrating a massive $10 million Ponzi scheme. See *United States  v. John F. Hogan*, (17-100 WDPA, Hornack, J).  Meanwhile, there is nothing in the PSR or information in <u>Defendant's Objections</u> that suggest Mr. Nocito is "elderly and infirm."

The PSR highlights Mr. Nocito's medical conditions which are common age-related health conditions that can be treated and managed in a prison setting.  The United States will present evidence from BOP physicians supporting that BOP facilities are well equipped to address Mr. Nocito's age and health. He is not non-ambulatory, wheelchair bound, or bedridden. He is certainly not an invalid.  Despite a potential knee replacement, reported obesity and the use of heart medication, his current medical conditions do not render him infirm, nor are they conditions present to an unusual degree and distinguishable from the typical cases covered by the guidelines.  Indeed, of the listed medications in the PSR, many are routine "over-the-counter" vitamins or health supplements not designed to treat any disease.  PSR para. 41; USSG Section 5H1.1; 5H1.4,  see also, <u>United States v. Lewis</u>, 594 F.3d 1270, 1276-77 (10th Cir. 2010).

(defendant's age and chronic diseases were insufficient to warrant a downward departure under 5H1.1 since the defendant was not deemed infirm.)

## IV.  Defendant's Requests for Departures for Family Ties or Caretaking Support under 5H1. 6 is Not Worthy of this Court's Consideration

The Defendant also seeks a downward departure based upon "family ties" and principally argues that his "9 children and grandchildren"… "rely heavily on Mr. Nocito's financial support." Mr. Nocito has no minor children, and presently resides with his wife in *Villa Noci*. He claims nevertheless that he provides for his "school aged grandchildren educational expenses and significantly assists with all nine individuals life expenses." <u>PSR Objections</u>, pp 6-7.  No mention is made of what type of "life expenses" he provides, or why they are necessary to the nine.   To follow this, are we to believe that Mr. Nocito provides all nine with financial sustenance for his employed and financially stable adult children and grandchildren?  Respectfully, this is an absurd use of 5H1.6, which is clearly meant only  to assist immediate family members who will sustain a "substantial, direct and specific loss of essential caretaking and financial support" if a defendant is incarcerated.  5H1.6, n.(B).

First, Mr. Nocito's characterization that he has nine "children and grandchildren" who "rely heavily on Mr. Nocito's financial support," leaves out critical facts.  The PSR provides that Mr. Nocito has 7 grandchildren, between his two adult children, Joe Jr. and Gina Marie, between the ages of 5 and 23.  PSR para. 38.  Joseph Jr.,  is 53 years old, lives in Sewickley with his family, has 5 children, and is employed by three different Nocito family companies: NEI, Gateway Hospice, and Old Stonewall Golf Club. Joseph Jr. has three adult aged children, one in his 20's, one in college, and one in her teenage years.  Two of Joseph Jr's. children could be deemed

minors.   While the United States has no W-2 forms for Joe Jr., no doubt he is handsomely compensated since his father owns the companies. His home in Sewickley was purchased in 2014 for approximately $2.7 million dollars, and is 18,000 sq. ft.

Similarly, his daughter, Gina Marie, is described in the PSR as 45 years old, a beach body trainer, nutritionist, and an employee of NEI.   PSR para. 48.   Gina has two minor children. Mr. Nocito claims that his caretaking support is necessary for their "private school" and "college tuition" expense.  Objections, pp 6-7.  Gina lives in Sewickley Township, also in an 8,200 sq. ft. home purchased in 2014  for $1.6 million dollars.  Would, therefore, Mr. Nocito's absence in prison portend financial doom for the Nocito offspring?

Initially, it is undisputed that likely as early as calendar year 2000, Mr. Nocito has been, and continues to be, a multi-millionaire.  see Points 7 and 17 of Wisdom, Thoughts and Life Lessons, above.  He has built an empire through a legitimate health care company located on McKnight Road called Automated Health Systems Inc.  Evidence at sentencing will show that he has accumulated substantial personal wealth in cash, real estate, luxury vehicles and the like, beginning with the construction of  (at taxpayer's expense) of a $30 million dollar home in Bell Acres, and property in Allison Park.   Records provided by Mr. Nocito to the probation officer reveal his ownership of at least "115 businesses", multiple luxury vehicles, and significant savings in mutual fund accounts, life insurance policies, and a checking account which currently reflects a balance of $1.9 million dollars.  PSR paras. 50 and 51.  Because the Defendant refused to complete the required "Net Worth and Monthly Cash Flow Statement" (despite repeated requests by the probation officer), the Court and government are unaware of the Defendant's true net worth; therefore, the  PSR officer could only conclude from her review and report to the Court that the

10

Defendant likely has a "positive net worth in the millions of dollars." He has even agreed to pay "any fine" imposed by the Court. PSR para. 50.[8]

Nevertheless, Policy Statement 5H1.6 is not meant to ensure a "Buckingham Palace" like existence for his family when he is incarcerated. The sentencing evidence clearly will show that he is not his children nor his grandchildren's immediate caretaker or primary source of financial support. What defendant provides to his offspring is given merely out of his excess beneficence and affection, not for their daily sustenance, and Defendant's request for variance under 5H1.6 cannot be sustained. [9]


## V. THE DEFENDANT'S CIVIC OR CHARITABLE CONTRIBUTIONS SIMILARLY DO NOT WARRANT A DEPARTURE

Lastly, the Defendant somehow contends that his community and church financial support should be a basis for a departure from the Guidelines. However, USSG 5H1.11 specifically provides that a defendant's "civic, charitable or public service employment-related contributions or good works are ordinarily <u>not relevant</u> in determining whether a departure is warranted." USSG 5H1.11 (emphasis added). Nevertheless, Mr. Nocito attaches multiple character reference letters to his <u>Objections to PSR</u> referencing his noble character, good deeds, and charitable donations made to organizations, and claims to have donated "millions of dollars to charitable organizations

---

[8] Defendant's refusal to complete the Net Worth statement is a first for this prosecutor. Mr. Nocito has a team of attorneys, accountants and personnel at his request to calculate and summarize for the Court the Defendant's Net Worth. Moreover, this hearing has been continued 2x since March, 2023, plenty of time to complete it. Admittedly a defendant's Net Worth is primarily relevant to the Court's determination of a defendant's ability to pay a fine and restitution, and here, he has agreed to make full restitution. But it does become otherwise relevant in the Court's USSG Section 3553 analysis if the Defendant contends that his financial assistance is essential for his family caretaking. Therefore,, it's pure speculation as to why it is not completed.

including the Roman Catholic Church and Robert Morris University."  PSR Objections, p.15. Though laudable, they do not eviscerate the fraud and the necessity of imposing just punishment. Individuals blessed with vast means are expected to benefit the less fortunate.  No defendant should be able to buy his or her way out of just punishment.

        In summary, the United States will argue at sentencing that in accordance with the 18 U.S.C. Section 3553 factors, Mr. Nocito deserves a sentence of incarceration within the proposed USSG range in the Plea Agreement; that he is not entitled to any departures or variances under USSG 5H et seq, and that his incarceration should begin immediately. The United States' reserves the right to supplement this Response in its <u>Sentencing Memorandum</u> and at the sentencing hearing.

Respectfully submitted,

ERIC G. OLSHAN
United States Attorney

*/s/Gregory C. Melucci*
GREGORY C. MELUCCI
Assistant U.S. Attorney
PA ID No. 56777

*/s/Nicole A. Stockey*
NICOLE A. STOCKEY
Assistant U.S. Attorney
PA ID No. 306995